1    Allan L. Schare  (State Bar No. 126305)
2    aschare@tocounsel.com
     Jon-Jamison Hill  (State Bar No. 203959)
3    jhill@tocounsel.com
     Brian J. Headman  (State Bar No. 284508)
4    bheadman@tocounsel.com
     THEODORA ORINGHER PC
5    1840 Century Park East, Suite 500
     Los Angeles, California 90067-2120
6    Telephone:  (310) 557-2009
     Facsimile:  (310) 551-0283
7
8    Perry J. Viscounty  (State Bar No. 132143)
     perry.viscounty@lw.com
9    David D. Troutman  (State Bar No. 261556)
     david.troutman@lw.com
10   Allison S. Blanco  (State Bar No. 287554)
     allison.blanco@lw.com
11   LATHAM & WATKINS LLP
     650 Town Center Drive, 20th Floor
12   Costa Mesa, California  92626-1925
     Telephone: (714) 540-1235
13   Facsimile: (714) 755-8290
14
15   Attorneys for Plaintiff Metagenics, Inc.
16
                 **UNITED STATES DISTRICT COURT**
17
         **CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION**
18

| 19  METAGENICS, INC., a Delaware corporation, | Case No. 8:17-CV-00173 |
|---|---|
| 20 | |
| 21               Plaintiff, | **COMPLAINT FOR:** |
|                | **(1)  BREACH OF CONTRACT** |
| 22        vs. | **(2)  BREACH OF FIDUCIARY DUTY** |
|                | **(3)  AIDING AND ABETTING** |
| 23  JOHN P. TROUP, an individual; |      **BREACH OF FIDUCIARY DUTY** |
|     JENNA C. TROUP, an individual; | **(4)  BREACH OF DUTY OF** |
| 24  RADISHING MEDICAL, LLC, a |      **LOYALTY** |
|     Massachusetts limited liability | **(5)  AIDING AND ABETTING** |
| 25  corporation; TreatMNT, an entity of |      **BREACH OF DUTY OF** |
|     unknown form; and DOES 1-10, |      **LOYALTY** |
| 26 | **(6)  BREACH OF CONTRACT** |
| 27               Defendants. | **(7)  MISAPPROPRIATION OF** |
|                |      **TRADE SECRETS –** |
| 28 |      **VIOLATIONS OF 18 U.S.C. §1836** |

THEODORA ORINGHER
COUNSELORS AT LAW

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**(8)  MISAPPROPRIATION OF TRADE SECRETS – VIOLATIONS OF CAL. CIV. CODE §3426, *ET SEQ.***
**(9)  FRAUD**
**(10) INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**
**(11) UNFAIR COMPETITION – VIOLATIONS OF CAL. BUS. & PROF. CODE §17200, *ET SEQ.***
**(12) DECLARATORY RELIEF**

**[DEMAND FOR A JURY TRIAL]**

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

Plaintiff Metagenics, Inc. ("Plaintiff" or "Metagenics"), a Delaware corporation headquartered in Orange County, California, hereby sues defendants John P. Troup ("Mr. Troup"), Jenna C. Troup ("Ms. Troup"), Radishing Medical, LLC ("Radishing"), TreatMNT (an entity of unknown form) and Does 1 through 10, demands a jury trial, and alleges as follows:

## INTRODUCTION

1. Metagenics is a nutrigenomics company headquartered in Orange County, California, serving more than 75,000 healthcare providers worldwide through premium quality, science-based medical foods, nutritional formulas, and lifestyle management programs designed to help their patients achieve a lifetime of good health. In the United States, Metagenics sells its products exclusively through healthcare practitioners.

2. Metagenics' scientific staff—among the largest in the nutrigenomics industry—has published more than 80 articles in peer-reviewed journals and their work has resulted in Metagenics obtaining more than 60 patents in the United States and around the world. The patents and other intellectual property developed for Metagenics by its employees are crucial to Metagenics' success in the very competitive market for functional medicine and healthcare products.

3. Metagenics' success is also driven, in large part, by its carefully cultivated network of collaborators, including renowned medical experts and institutions, with whom Metagenics works to deliver products and solutions to help healthcare practitioners stay on the leading edge of functional medicine. Metagenics takes steps to protect the confidential and proprietary information related to its business, including its collaborations, products, suppliers, distributors, customers and prospective customers, and other valuable information related to the research, development, manufacture or sale of Metagenics' products. Such steps include the

execution of written contracts with its employees and consultants that govern their use of Metagenics' confidential information.

4.    From September 27, 2012 until his resignation on December 16, 2016, Mr. Troup was the Executive Vice President and Chief Science Officer of Metagenics, reporting directly to the company's Chief Executive Officer. As Chief Science Officer, Mr. Troup was entrusted with access to Metagenics' most valuable and confidential information. His access to, and use of, such information was strictly governed by his written confidentiality agreement with the company, which prohibited him from, among other conduct, disclosing or exploiting Metagenics' confidential information, or retaining it after his employment ended. As a senior executive and head of Metagenics' Research and Development division, Mr. Troup had access to all clinical and research reports, product formulas, and important intellectual property of Metagenics. Mr. Troup was also trusted to make certain hiring decisions and had access to Metagenics' roster of collaborators and research partners. In short, Mr. Troup was entrusted with wide-ranging authority and access to Metagenics' most valuable information, resources, and relationships. Mr. Troup violated that trust, emphatically and repeatedly.

5.    Mr. Troup did so in secret partnership with his daughter, Ms. Troup, whom Mr. Troup had engaged under the guise of serving as a Metagenics consultant. Together, Mr. and Ms. Troup—while Mr. Troup was employed by, and both of them were under contractual obligations to, Metagenics—used and diverted Metagenics' confidential information, money, resources, and relationships to develop a directly competitive business. They secretly developed product offerings, registered domain names, filed patent applications, developed trademarks, and formed Radishing Medical LLC, the entity through which they apparently have operated their competing venture. Moreover, in the weeks and months leading up to his departure from Metagenics, Mr. Troup forwarded at least dozens of internal Metagenics emails containing more than 40 attachments of confidential, proprietary

and trade secret information, to his and Ms. Troup's personal email addresses.  He also attempted to cover his tracks by deleting hundreds, if not thousands, of emails from his Metagenics email account.

6.     Mr. Troup and Ms. Troup's secret competing venture, developed with Metagenics' money and confidential information, is apparently called "TreatMNT," which includes in part an acronym for medical nutrition therapy, a large and important part of Metagenics' business.  Metagenics did not discover the existence of the TreatMNT website or business until January 2017, after Mr. Troup resigned from the company.  Metagenics has since learned that Mr. Troup and Ms. Troup promoted their new company at another vendor's booth at a Las Vegas industry trade show in mid-December 2016 and have plans to promote the business and begin to sell their products, which are direct knock-offs of Metagenics' products, at their own booth at another industry trade show in New York in late February 2017.

7.     Mr. and Ms. Troup's conduct violates a number of state and federal laws, violates their respective agreements with Metagenics, and breaches Mr. Troup's fiduciary duties owed to Metagenics.

8.     Metagenics brings this lawsuit to put a stop to the defendants' unlawful conduct, protect its confidential and proprietary information, recover the intellectual property assets (including patent applications, trademarks, and associated domain names) to which it is entitled under contract and principles of equity, and obtain compensation for the violations that have occurred thus far.

## JURISDICTION AND VENUE

9.     This is a civil action alleging breach of contract, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of duty of loyalty, aiding and abetting breach of duty of loyalty, misappropriation of trade secrets in violation of 18 U.S.C. §1836, misappropriation of trade secrets in violation of California Civil Code § 3426 *et seq.*, fraud, intentional interference with prospective economic

1    advantage, unfair competition in violation of California Business & Professions

2    Code § 17200 *et seq.*, and a claim for declaratory relief.

3        10.    Pursuant to 18 U.S.C. §1836(c), this Court has subject matter

4    jurisdiction over Metagenics' claims for relief for violation of the federal trade

5    secrets statute.   Pursuant to 28 U.S.C. §1367(a), this Court has supplemental

6    jurisdiction over Metagenics' state law claims because all of Metagenics' claims

7    arise out of a common nucleus of operative facts.  This Court also has subject matter

8    jurisdiction under 28 U.S.C. §1332 because the matter in controversy, exclusive of

9    interest and costs, exceeds the sum of $75,000 and is between citizens of different

10   states.   Metagenics is a citizen of the State of California and all defendants are

11   citizens of other states.

12       11.    In addition, the Employee Assignment and Confidentiality Agreement

13   between Metagenics and Mr. Troup specifically provides that any proceedings

14   regarding a dispute arising under the Agreement shall take place exclusively in Los

15   Angeles County or Orange County, California.

16       12.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b)(2),

17   because a substantial part of the events or omissions giving rise to Plaintiff's claims

18   occurred in this District.  Venue is also proper in this District because Mr. Troup

19   consented to exclusive venue within this District.

20                          **THE PARTIES**

21       13.    Plaintiff Metagenics, Inc. is a Delaware corporation with its principal

22   place of business in Aliso Viejo, Orange County, California.

23       14.    Defendant John P. Troup is an individual residing in Gig Harbor,

24   Washington and a citizen of the State of Washington.  From September 2012 until

25   his resignation effective December 16, 2016, Mr. Troup was employed as the Chief

26   Science Officer of Metagenics.  In that capacity, he was an officer of the company

27   and he served as the head of Metagenics' research and product development and

28   testing division in Gig Harbor, Washington.

15.     Defendant Jenna C. Troup is an individual who, on information and belief, resides in the Boston, Massachusetts area and is a citizen of the State of Massachusetts.   Beginning in July 2014, Ms. Troup served as an independent contractor for Metagenics pursuant to a written agreement.

16.     Defendant Radishing Medical LLC is a Massachusetts limited liability company with its principal office located in Cambridge, Massachusetts.   Radishing was formed on July 29, 2015 by Ms. Troup, who serves as Manager of the entity. Radishing's filings with the Secretary of the Commonwealth of Massachusetts, Corporations Division, describe its business character and services as "Business Consulting Services, Healthcare Programming and Clinical Development."   On information and belief, Radishing is owned, managed, and/or controlled directly or indirectly, by Mr. Troup and Ms. Troup.

17.     Defendant TreatMNT is an entity of unknown form.   On information and belief, TreatMNT operates, among other things, a website located at www.treatmnt.com, a Twitter account @TreatMNT_now and an Instagram account @TreatMNT, each of which have been created by defendants Mr. Troup and Ms. Troup to develop and conduct a business using the proprietary information of Metagenics in direct competition with Metagenics.

18.     Metagenics is unaware of the true names and capacities of defendants named as Does 1 through 10, inclusive.   Metagenics will amend this Complaint to state said defendants' true names and capacities when the same have been ascertained.   Metagenics is informed and believes, and upon that basis alleges, that said fictitiously named defendants are responsible in some manner for the injuries and damages to Metagenics as alleged herein.

19.     Metagenics is informed and believes, and upon that basis alleges, that at all times herein mentioned, each of the defendants was the agent, servant, and/or co-conspirator of the other defendant, and, in doing the acts hereinafter alleged, was acting within the course and scope of its authority as such agent, servant, and/or co-

1  conspirator with the permission and consent of its co-defendant and, further, that the

2  defendants, and each of them, have authorized, ratified, and approved the acts of the

3  other defendant with full knowledge of those acts.

4  **GENERAL ALLEGATIONS**

5  I.  **Metagenics Hires Mr. Troup, Contingent on His Agreement to be Bound**

6  **by A Written Agreement Governing His Treatment of Confidential**

7  **Information and the Assignment/Ownership of IP/Work Product.**

8  20.  In September 2012, Metagenics hired Mr. Troup as its Chief Science

9  Officer.  In that capacity, Mr. Troup was responsible for, among other things,

10  leading and overseeing the company's global research and development strategy and

11  execution, from basic research through product development and commercialization.

12  21.  Mr. Troup's job description summarized the broad scope of his

13  responsibilities as follows:

14  
15  The [Chief Science Officer] will oversee the company's clinical trial
   activities and will work with universities, practitioners, MDs,

16  suppliers, etc.  He/she will be responsible for the investigation of new
   technologies, ingredients, platforms, and diagnostic assessment tools,

17  experimentation and development of therapeutic products of
   biomedical and clinical sciences that will be applied to the company's

18  targeted ten chronic illness areas.  He/she will be responsible for the
   company's overall portfolio of products and the advancement of

19  
20  products through the company's product development and renovation
   cycle.

21  

22  22.  On September 27, 2012, his first day of employment, Mr. Troup signed

23  a comprehensive assignment and confidentiality agreement (the "Assignment and

24  Confidentiality Agreement").[1]  A true and correct copy of the Assignment and

25  Confidentiality Agreement is attached hereto as Exhibit A.

26  

27  _____

28  [1] Unless otherwise indicated, capitalized terms in this Complaint are used as
   defined in the Assignment and Confidentiality Agreement.

THEODORA ORINGHER
COUNSELORS AT LAW

23.     By signing the Assignment and Confidentiality Agreement, Mr. Troup agreed that he would, both during and after his employment with Metagenics, (a) keep the company's Confidential Proprietary Information in strict confidence, (b) not disclose, publish or make available the company's Confidential Proprietary Information to any person outside the company, (c) not sell, transfer, use or exploit the company's Confidential Proprietary Information or permit its use or exploitation by third parties, and (d) not remove or retain any of the company's Confidential Proprietary Information upon termination.  Mr. Troup also agreed, under Section 2.2. of the Assignment and Confidentiality Agreement, to immediately notify Metagenics of any "unauthorized access to or possession or knowledge of Confidential Proprietary Information" of which he became aware.

24.     As is customary with full-time employed scientists whose primary job function is to conduct and supervise research, make new discoveries and develop new products for the employer's business, the Assignment and Confidentiality Agreement unequivocally establishes that Metagenics owns all rights, title and interest in all Work Product created by Mr. Troup while employed by the company.

25.     The Assignment and Confidentiality Agreement defines Work Product as follows:

> [A]ny and all created output, results and proceeds (including, without limitation, Data, Inventions, Know-How and Works, ***together with any associated Intellectual Property***) of one or more tasks performed by or on behalf of the Employee: (i) within the scope of the Employee's work at, or responsibilities to, the Company; (ii) within the Employee's field or discipline for which the Employee is engaged at the Company; (iii) in connection with or in furtherance of Company research, development, manufacture, marketing, business or in that which the Company is planning, or existing or future products or services of the Company; and/or (iv) with Company financial or in-kind support, including use of equipment and facilities, whether created on, prior to or following the date of this Agreement. (Emphasis added.)

26.     Section 3.1 of the Assignment and Confidentiality Agreement provides that all Work Product created by Mr. Troup while employed by the Company shall be considered "work made for hire" for which Metagenics "is the sole owner of all rights, title and interests therein."   Section 3.1 further provides that Mr. Troup "irrevocably transfers and assigns to the Company all right, title and interest in and to the Work Product."

27.     Finally, pursuant to Section 3.1, all Work Product created by Mr. Troup within six months after his termination "will be presumed to have been conceived during the employment with the Company, unless the Employee can prove conclusively that it was created after termination of employment with the Company."

28.     In Section 6.2 of the Assignment and Confidentiality Agreement, Mr. Troup confirmed that he "acknowledges and understands that the Company is engaged in a highly competitive business, that [he] will learn important and competitively sensitive information (including Confidential Proprietary Information) and skills at the Company, and that the Company would be severely harmed if such were to fall into the hands of a Competing Business."   Accordingly, Mr. Troup agreed that "[d]uring [his] employment with the Company, [he] shall not engage in any business activity that would be adverse to the business interests of the Company or its affiliates."   Mr. Troup further agreed that during his employment with Metagenics, he would not "directly or indirectly, engage or invest in, assist, counsel, advise, conduct research for or be employed by any Competing Business."

29.     Section 2.3 of the Assignment and Confidentiality Agreement requires Mr. Troup, upon termination of his employment, to (a) "deliver to the Company all originals and copies (in whatever medium or format recorded) of any and all Confidential Proprietary Information that are in [his] control or possession" and (b) "destroy or delete all excerpts, quotations, synopses, summaries, compilations, abstracts, and other records of any portions of Confidential Proprietary Information

contained in any documents, materials or other records retained by [Troup] (in whatever medium or format recorded)."

30.    Section 6.3 of the Assignment and Confidentiality Agreement prohibits Mr. Troup, for a period of one year after leaving Metagenics, from approaching, encouraging, soliciting or assisting any of the company's employees to leave the employment of Metagenics.

31.    From time to time, Metagenics reminded Mr. Troup of his obligations to Metagenics.  For example, after Metagenics' Board of Directors re-elected him to the position of Executive Vice President, Chief Science Officer in August 2016, Metagenics' provided Mr. Troup with a written summary of his legal duties to Metagenics.  That document explained, among other things, Mr. Troup's duty of loyalty, obligation not to compete with Metagenics, duty to report relevant matters and duty to act with due care and in good faith.

## II.    Mr. Troup Orchestrates Metagenics' Employment of Ms. Troup as a Consultant.

32.    On or about July 22, 2014, Mr. Troup retained the services of Ms. Troup as a contractor to provide consulting services to Metagenics.

33.    Ms. Troup and Metagenics entered into a written agreement dated July 24, 2014 (the "Service Agreement").  Mr. Troup, in his capacity as Chief Science Officer, signed the Service Agreement on behalf of Metagenics.  A true and correct copy of the Service Agreement is attached hereto as Exhibit B.

34.    The Service Agreement contained a Statement of Work which defined the scope of Ms. Troup's services as follows:

> Provide consulting services and finished work product and materials supporting the strategic development and program support with external and internal collaborators in medical affairs, medical education and medical marketing initiatives which are focused on the commercial launch of the medical foods portfolio and lifestyle medical programs.

35.    Ms. Troup's "deliverables" under the Statement of Work included (a) managing the collaboration of Boston based Metagenics clinical partners for medical foods and specific medical nutrition therapy/personalized medicine programs; (b) defining and developing appropriate practitioner management "kits" or programs for the MNT module; (c) directing the coordinated activities and output of the collaborating global partners of Metagenics; and (d) providing support for the eHealth initiative on the non-branded web site of Metagenics, which was called the Metagenics Healthcare Institute for Clinical Nutrition, or MHICN.

36.    By signing the Service Agreement, Ms. Troup expressly agreed to maintain as confidential all proprietary information that she obtained during the performance of her services for Metagenics, including "samples, formulas, techniques, marketing programs and plans, price information, product lists, customer lists, skills and technology, business plans, intellectual property information and financial information."

37.    Ms. Troup also agreed, by signing the Service Agreement and as a necessary condition of her employment as a consultant of Metagenics, that all work product and deliverables, including all ideas, concepts, works, improvements and modifications which are created by Ms. Troup pursuant to the agreement are "assigned, transferred and completely conveyed" to Metagenics as its sole and exclusive intellectual property.

38.    Ms. Troup rendered two invoices to Metagenics and was paid by Metagenics for her services.  Ms. Troup was also reimbursed for travel expenses purportedly incurred by her for Metagenics business as late as February 2016.  Mr. Troup approved each of Ms. Troup's expense reports in writing.

///
///
///
///

### III.    Mr. and Ms. Troup Launch Scheme to Defraud, Exploit, and Unlawfully Compete with Metagenics.

39.    Based on evidence uncovered by Metagenics following Mr. Troup's resignation in December 2016, Mr. and Ms. Troup launched their secret plan to defraud, exploit, and unfairly compete with Metagenics at least as early as the summer of 2015.

40.    During June and July 2015, Mr. Troup and Ms. Troup arranged to have Ms. Troup enter into a consulting agreement with Erasmus MC University Medical Center in Rotterdam, The Netherlands, one of Metagenics' major research partners in Europe.  At Mr. Troup's behest, Metagenics has paid Erasmus several million dollars over the last several years.

41.    The consulting agreement between Ms. Troup and Erasmus states that Ms. Troup would "provide coordination and assistance as 'Senior Project Strategy and Commercialisation Manager' to all projects between ErasmusAGE and Metagenics."  The term of the agreement is three years—through July 1, 2018.  Ms. Troup is paid 7,830 Euros per month, or more than US$100,000 per year, by Erasmus under this consulting agreement.

42.    In an apparent attempt to cover up her involvement with Erasmus, Ms. Troup incorporated a limited liability company called Radishing Medical LLC in Massachusetts on July 29, 2015 and asked Erasmus to name Radishing (not Ms. Troup) as the party to the consulting agreement.

43.    On information and belief, Ms. Troup continues to serve in her consulting position with Erasmus.

44.    On information and belief, Mr. and Ms. Troup led Metagenics' research partners at Erasmus to believe that the project for which they were providing research assistance, being paid millions of dollars by Metagenics, and employing Ms. Troup, was for Metagenics.  In reality, the work done by Erasmus was

COMPLAINT

misappropriated and utilized by Mr. and Ms. Troup as the early stage seed research for what has now become their competing business.

45.   Mr.   and   Ms.   Troup   call   their   new   venture   "TreatMNT." Unsurprisingly, the name is based on and incorporates a core component of Metagenics' own business, medical nutrition therapy ("MNT").

46.   Mr. and Ms. Troup continued developing the TreatMNT business in November 2015, when they engaged the American College of Preventative Medicine ("ACPM") in Washington, DC to develop and create a medical nutrition therapy module.

47.   ACPM sent an initial $25,000 invoice for the work to Ms. Troup at her personal email address on November 12, 2015, and addressed the invoice to Ms. Troup as the "Senior Manager, Healthcare Strategy and Innovation, Precision Medicine and Clinical Nutrition" at Metagenics (without an address) – a position Ms. Troup never held.

48.   On December 3, 2015, Mr. Troup sent an email to his assistant directing Metagenics to pay the ACPM invoice, his assistant then submitted a form check request to accounting, and Metagenics paid the $25,000 invoice in full.

49.   On information and belief, Mr. Troup and Ms. Troup told ACPM that the medical nutrition therapy module being created was for Metagenics.  In reality, the work done by ACPM, and paid for by Metagenics, was actually intended for Mr. Troup and Ms. Troup's competing business, TreatMNT.

## IV.   Mr. Troup Seeks Funding for His Secret Competitive Venture.

50.   Between November 25 and December 10, 2015, Mr. and Ms. Troup's emails indicate that they discussed their efforts to secure funding for their new medical nutrition therapy business from the Harvard Innovation Launch Lab (or "Harvard iLab").   They apparently pitched the concept as "The Metagenics Healthcare Institute for Clinical Nutrition" or "MHICN," but in response to a

question from Harvard iLab about whether MHICN is a part of Metagenics or a stand-alone company, Mr. Troup instructed Ms. Troup to tell Harvard iLab that "MHICN is set up as an incubator and start up group and intended to be stand alone. . . . 1 year seed funding in place, 2nd year committed with key milestones achieved. Depending on initial successes, we would then seek VC funding in year two and three."

51.    This characterization of MHICN was false.   MHICN is simply a Metagenics website containing medical and scientific information for its medical practitioner customers.  It is not an "incubator," a "start up group," or a separate company.  Metagenics never authorized or was aware of the use of its name or the MHICN name for the purpose of engaging in a pitch for funding for TreatMNT or any other venture.

52.    Ms. Troup then set up a meeting with Harvard iLab for December 11, 2015.  In preparation for the meeting, Mr. Troup provided talking points for Ms. Troup, including:

- "MHICN is intended to be a healthcare service provider for integrative and lifestyle medicine practitioners"
- "It will deliver MNT precision medicine services and products"
- "It leverages technology and IP from [various Metagenics research partners] and Metagenics"
- "It has start up seed money from Metagenics of $500k in year one to develop the specific business commercial model with channel strategy and positioning of the basic program already available"
- "With delivery of the business model in year one another traunch of funding of $1M will be provided in year two to put together the full business plan to execute"
- "Year three will be raising strategic investment and or VC funding or some combination"

53.    None of the foregoing descriptions of MHICN was correct, and none of the activities ascribed to MHICN was known to, budgeted for, or approved by

Metagenics' management.  In particular, Metagenics' management was not informed by Mr. Troup, Ms. Troup, or anyone else, that a Metagenics project would be "set up as an incubator and start up group and intended to be stand alone" or seek "strategic investment" or outside VC funding.  Nor had Metagenics provided "seed money" of $500,000 (or any other amount) to develop this competing business for Mr. Troup and Ms. Troup.  Funding a startup venture is not consistent with Metagenics' business model, and it was never discussed with Metagenics' management.

54.    On December 23, 2015, Ms. Troup emailed Mr. Troup to report that Harvard iLab told her that "we are not far enough along in the product/company development to join the Launch Lab at this time."  However, Harvard iLab invited Ms. Troup to stay in touch as they progress the business, and specifically suggested that they "[c]ome up with a company name and website that are separate from Metagenics."

## V.    Mr. Troup Develops the TreatMNT Trademark, Registers Domains Incorporating that Mark, and Misappropriates Metagenics' Research Reports to Develop the TreatMNT Business Plan.

55.    On December 28, 2015, Mr. Troup registered the *TreatMNT.com*, *TreatMNT.net*, and *TreatMNT.org* website domains, together with twelve other variations thereof[2] (these domain names, along with any social media accounts, including the @TreatMNT_now Twitter account and the Instagram account @TreatMNT, are collectively referred to herein as, the "Domain Names"), on GoDaddy.com using his personal AOL email address, phone number and New

---

[2] The other website domains include:  treatprecision.com, treatpmn.com, treatmnt.net, treatmnt.info, treatpmn.net, treatpmn.org, treatpmn.info, treatprecision.net, treatprecision.org, treatprecision.info, treat.solutions and treat.healthcare.  Metagenics is continuing its investigation but believes that there are additional website domains that Mr. Troup registered in his personal name while he was employed by Metagenics and did so at Metagenics' expense.

THEODORA ORINGHER
COUNSELORS AT LAW

Jersey residential address as the contact information.  Mr. Troup charged the registration fees and one year website hosting charges to his Metagenics company credit card, submitted expense reimbursement forms to accounting indicating that the charges were proper business expenses, and Metagenics paid these bills without understanding that the services were not being rendered for the benefit of Metagenics.

56.    Mr. Troup never told anyone in Metagenics management about the Domain Names.

57.    After settling on a name (TreatMNT) and registering the related Domain Names, Mr. and Ms. Troup continued to build their competing business, including by engaging a third party to design the TreatMNT website.

58.    In addition, Mr. and Ms. Troup identified confidential Metagenics market research reports to aid their preparation of a "business plan/prospectus" and "design specifications for TreatMNT," and, on information and belief, copied those reports from Metagenics' servers onto a flash drive.

## VI.    Mr. Troup Solicits Venture Capital Financing for TreatMNT, and Diverts Funds From Metagenics.

59.    On January 22, 2016, Mr. and Ms. Troup discussed pitching TreatMNT at an AARP event focused on securing venture capital funding for new start-ups.

60.    On March 12, 2016, Mr. Troup emailed Ashok Dhanrajgir at Inventages, which bills itself as "one of the world's largest life-sciences, nutrition and wellness focused venture capital fund managers" based in London, Hong Kong, and the Bahamas.  Mr. Troup began the email, which was entitled "Project Description," by saying "we are interested in expanding a project with technologies in place and expand it from a kind of 'skunk' works to a formal start-up."  The email continues to describe the business concept and identify the venture's partners (including Harvard iLab) and says, "Our code name for this project has been 'treatMNT'."

61.    Mr. Troup represented to the potential funding source, Mr. Dhanrajgir, as follows: "We'd like to work with a venture partner to complete the business model and framework and treat as a start-up with investment funds.  We anticipate a three year program and roughly $30M investment over this time based on specific and key milestones."

62.    Mr. Troup made no mention of any involvement by Metagenics in the TreatMNT venture.

63.    By April 2016, the TreatMNT.com website was completed using the services of Flybox Media and went "live," hosted on the Go Daddy platform arranged by Mr. Troup and paid for by Metagenics despite the fact that the services were not being rendered for the benefit of Metagenics.  Prior to launch of the TreatMNT.com website, Mr. Troup expressly approved the content of the website in an email to Ms. Troup on April 15, 2016.

64.    On April 25, 2016, Ms. Troup posted the first of several blog posts describing the company's business to the TreatMNT.com website.

65.    On April 28, 2016, Mr. Troup had an email exchange with a key Metagenics research partner with respect to one of Metagenics' most successful products.  At the conclusion of the exchange, the partner wrote, "John do keep me posted if you'd like to start a newCO.  Count me in!"  Mr. Troup shared this email exchange with Ms. Troup.

66.    On May 18, 2016, Mr. Troup emailed Ms. Troup (with a copy to Mr. Troup's wife's personal email address) a detailed business plan for TreatMNT (the "Business Plan").  The Business Plan makes reference to "our previous funding organization, the Metagenics Healthcare Institute for Clinical Nutrition," which it falsely claims had provided $100,000 in funding, and indicates that an unnamed "Angel Funding" source had provided another $250,000 in funding.

67.    The Business Plan boasted that TreatMNT's prototype product "in limited initial launch generated $1.5M over an 8 month period while we were incubated in the Metagenics Healthcare Institute for Clinical Nutrition."

68.    Metagenics had no knowledge that it purportedly "incubated" TreatMNT, did not incubate TreatMNT and certainly did not share in any of the proceeds allegedly generated from TreatMNT's initial launch.

69.    The Business Plan stated that TreatMNT intended to file patent applications within the next 6-10 weeks.

70.    The Business Plan identified certain "goals" for the next 9-12 months, including, "complete commercial plans and positioning and launch first product and introduce a second product."

71.    In addition to identifying a timetable for launch, the Business Plan identified TreatMNT's competitors (including Metagenics), as well as TreatMNT's potential industry expert partners.  Each potential partner identified in the Business Plan is a research and/or business partner of Metagenics with whom Mr. Troup worked directly during his employment with Metagenics.

## VII.   Mr. and Ms. Troup Continue Developing Their Competing TreatMNT Business While Mr. Troup Is Still Employed by Metagenics.

72.    On May 31, 2016, Mr. Troup's assistant submitted an invoice from Flybox Media to Metagenics' accounting department for payment to the third party web designer that Mr. Troup had engaged to develop the TreatMNT website.  Upon receipt, Metagenics' accounting department emailed Mr. Troup to inquire what budget the invoice should be applied to since it was not included in the budget. Thwarted in his attempt to have Metagenics foot yet another bill related to his secret competitive plan, Mr. Troup responded on June 1, 2016, "This was not an approved item and I've already talked to the vendor to clarify – it was already work he had done for a previous project . . . . So – there is no charge and he will be reversing the invoice."

73.    Mr. Troup's statements were false.   They were perpetrated by Mr. Troup to cover up the fact that he had sought to have Metagenics pay for development of the TreatMNT website (which is unrelated to Metagenics), but he was caught doing so.

74.    On information and belief, the invoice was ultimately paid by Ms. Troup at Radishing Medical.

75.    On June 9, 2016, Mr. Troup sent to Ms. Troup and to his personal AOL email address the "Latest version" of a marked up patent application entitled "Medical Food Formulations For Use In Medical Nutrition Therapy."    The document name of the attachment was "Change-Pro Redline v4- Radishing - MNT Program - Glucose(1) and Radishing ....doc."

76.    On July 4, 2016, Mr. Troup forwarded to Ms. Troup and his personal AOL email address a draft outline of a partnership agreement with "HealthyMation" for the sale and distribution of a HealthyMation weight management and health improvement program with the TreatMNT nutritional food product.

77.    On July 7, 2016, Mr. Troup exchanged emails with a professor at Harvard Medical School, concerning the professor's declination of an invitation to speak at an important industry conference organized by one of the founders of Metagenics.   The professor was one of Metagenics' key industry partners.   In response to Mr. Troup's inquiry "Was there anything specifically of concern you have with this meeting or something Metagenics can do to keep your participation?," the professor replied "Since we have a new agenda with your new company don't you think it best that I not go out for this one?"

78.    On August 4, 2016, Mr. Troup emailed Shaista Malik of UC Irvine to solicit opportunities for TreatMNT, which he characterized as "a specific entity . . . set-up to deliver and build [medical nutrition therapy programs] with selected Institutional partners."   He told Ms. Malik that "Jenna (cc'd above) can send you

more info."   Mr. Troup copied Ms. Troup on the email at her email address jenna@treatmnt.com.

79.   On November 3, 2016, one of Metagenics' research partners emailed Mr. Troup at Mr. Troup's Metagenics email address with a markup of an agreement regarding a "consulting arrangement with Radishing TreatMNT."   The draft agreement, dated August 25, 2016, was between the professor and "TreatMNT, L.L.C."   On the signature page, "J.C. Troup" – Ms. Troup's initials – is listed as Founder and President of TreatMNT.   In the draft agreement, TreatMNT is described as being "in the business of clinical research, development, and commercialization of health products."

80.   According to Ms. Troup's profile on the Angel List website, Ms. Troup is the "Founder & CEO of TreatMNT."   She describes herself as having worked globally in healthcare R&D and as "focused on integrating nutrition therapy into the healthcare system."

81.   On December 5, 2016—before tendering his resignation to Metagenics—Mr. Troup used his Metagenics email address to order a sample of an ingredient that could be used as an alternative to a key ingredient in an important Metagenics' medical food product.   Mr. Troup requested that the sample be sent to "one of our co-development groups" and provided his home address for delivery of the product.

82.   On information and belief, prior to his resignation and while he was bound by the obligations of the Assignment and Confidentiality Agreement, Mr. Troup prepared and/or caused to be filed with the United States Patent and Trademark Office (the "Patent Office") one or more provisional patent applications (the "Patent Applications") without (1) disclosing the Patent Applications to Metagenics, (2) assigning the Patent Applications to Metagenics, or (3) advising the Patent Office that Metagenics should be the owner of the Patent Applications.

///

**VIII.  Mr. Troup Resigns from Metagenics, Attends a Trade Conference at Metagenics' Expense Under False Pretenses, and Accepts Employment at a Competitor.**

83.     Mr. Troup tendered his resignation from Metagenics by telephone call to the company's Chief Executive Officer, Brent Eck, on December 5, 2016.  Mr. Troup confirmed his resignation in writing by email the next day.

84.     By agreement with Mr. Eck, Mr. Troup was permitted to travel to Las Vegas, at the company's expense, to attend a previously scheduled speaking engagement on the company's behalf at the American Academy of Anti-Aging Medicine's A4M World Congress Conference on December 9-11, 2016.  Mr. Troup assured Mr. Eck that he would act professionally and in Metagenics' best interests at the conference and in all respects pertaining to his resignation.  Mr. Troup's last day of employment was to be December 16, 2016.

85.     Unbeknownst to Metagenics at the time, on December 6, 2016, a message was posted on the @TreatMNT_now Twitter account.  The message stated "Hey @A4MEvents! We're coming to #LasVegas for you! #WomensHealth #Menopause #TreatYoSelf #Nutrition".  Accompanying the message was a picture of TreatMNT's "Flash Flush" product "For Menopause Symptom Relief."  This product appears to be a direct copy or knock-off of Metagenics' product "Estrovera."  The key active ingredient in the advertised Flash Flush product is the same active ingredient as in Estrovera – and is supplied by a Metagenics supplier with whom Mr. Troup worked closely while at Metagenics.  On information and belief, this message was posted on Twitter by Ms. Troup and/or Mr. Troup.

86.     On December 9 and 10, 2016—after providing notice of his resignation, but while still employed by Metagenics—Mr. Troup attended the American Academy of Anti-Aging Medicine's "A4M" conference in Las Vegas, Nevada.  Metagenics paid for Mr. Troup's travel to, and attendance at, the conference, and he was scheduled to speak on Metagenics' behalf at the conference. On information and belief, Ms. Troup also attended the A4M conference.

87.     On December 9, 2016, a message was posted on the @TreatMNT_now Twitter account.  The message stated "Hey @A4MEvents, we're with AGG at booth 407! Come talk #Menopause with us! #treatyoself #nutrition."  Accompanying the message was a picture of a product flyer for TreatMNT's "Flash Flush" product together with a flyer for a key Metagenics ingredient from Irvine, California-based Anderson Global Group, a Metagenics supplier.  On information and belief, this message was posted on Twitter by Ms. Troup and/or Mr. Troup.

88.     On December 10, 2016, a message was posted on the @TreatMNT_now Twitter account.  The message stated "Day 2! Getting Crafty! #womensealth @a4mWC2016 – at Sands Convention Center."  Accompanying the message was a picture of a product flyer for TreatMNT's "Flash Flush" product.  On information and belief, this message was posted on Twitter by Ms. Troup and/or Mr. Troup.

89.     While Mr. Troup was being paid to represent Metagenics at the conference, his new venture, TreatMNT, displayed its product offerings at a booth at the conference.

90.     Upon his departure from Metagenics on December 16, 2016, Mr. Troup did not share with Metagenics any plans regarding his next business venture.

91.     On December 22, 2016, in accordance with its normal practice for departing executives, Metagenics sent Mr. Troup a letter reminding him of his continuing contractual obligations to the company under the Assignment and Confidentiality Agreement.  The letter highlighted Section 2.1 of the contract, which dealt with disclosing or transferring Metagenics' Confidential Proprietary Information, Sections 2.3 and 4, which required Mr. Troup to return property to Metagenics upon termination of his employment, and Section 6.3, which prohibits Mr. Troup from soliciting Metagenics' employees for a period of time after his departure.  The letter requested that Mr. Troup acknowledge, sign and return a copy, but Mr. Troup never did so.

92.     Approximately two weeks after Mr. Troup's last day with Metagenics, on January 4, 2017, Metagenics learned through a press release that Mr. Troup had accepted a new position as Vice President, Clinical Science, Education and Innovation at Standard Process Inc., a Wisconsin-based competitor of Metagenics.

**IX.  Metagenics' Learns of Mr. Troup's Unlawful Conduct and Efforts to Destroy Evidence of His Scheme.**

93.     After Mr. Troup's last day of employment, Metagenics performed a routine review of Mr. Troup's company-owned computer and email account to facilitate a smooth transition of his responsibilities and ongoing projects.

94.     This review uncovered evidence that, throughout the weeks prior to his departure from Metagenics on December 16, 2016 (including the very last day of his employment), Mr. Troup forwarded several dozen internal Metagenics emails containing more than 40 attachments of confidential and proprietary information to his personal AOL email address.

95.     The emails and attachments taken by Mr. Troup consisted of highly sensitive trade secret information, including but not limited to the formulas and compositions of many Metagenics products, internal sales and marketing data regarding Metagenics' product portfolio, and market research and analysis identifying Metagenics' product development and market expansion opportunities. Mr. Troup also forwarded valuable confidential Metagenics' work product, such as research and development reports regarding potential product ingredients, compilations of test results and literature supporting the clinical claims made by Metagenics regarding the attributes of its products, and research conducted by Metagenics into competing products.  In many instances, the documents taken by Mr. Troup were marked on their face as "Metagenics Confidential" or for "Internal Use Only."  In addition, Mr. Troup forwarded confidential proprietary information of third parties which was in Metagenics' possession and governed by confidentiality agreements of which Mr. Troup was aware.  This includes

confidential proprietary information of Access Business Group LLC and its affiliates.

96.     This collection of highly confidential trade secret information, which was misappropriated by Mr. Troup in violation of his agreement with Metagenics, could provide a road map to establish a competing business and develop, manufacture, and market products in direct competition to Metagenics.

97.     The evidence further showed, as described above, that Mr. Troup used Metagenics' financial resources (including direct payments of substantial sums of money to third parties and both direct and indirect payments to Ms. Troup), confidential and proprietary information, research partners' work product (paid for by, and belonging to, Metagenics), and supplier relationships to formulate the business plan, develop products, seek venture capital funding, and launch a competing business, all in express violation of the provisions of his Assignment and Confidentiality Agreement.

98.     Moreover, the evidence showed, as described above, that Mr. Troup orchestrated this scheme under the false pretense that he was developing the business, its products, programs, and promotional materials (including a website and Twitter account) *for* Metagenics. Mr. Troup told Metagenics' research partners that the work they were doing to study and validate the programs and products for the new venture was for a Metagenics internal project.  This was patently false.  In reality, Metagenics had no knowledge of Mr. Troup's scheme until it came to light after Mr. Troup departed from the company.

99.     Finally, the evidence shows that, prior to his departure, Mr. Troup attempted to cover his tracks by deleting the record of emails received by, sent or forwarded from, his Metagenics email account.  While his efforts to conceal his wrongdoing were not entirely successful, his deletion of relevant evidence has rendered it difficult, if not impossible, for Metagenics to independently determine

the full extent of his theft and disclosure of trade secret and confidential information. Discovery in this action will likely uncover additional wrongdoing.

100. Mr. Troup never sought, and Metagenics never gave, permission for Mr. Troup to remove or retain any of Metagenics' proprietary and confidential information upon his departure from the company.

## X.   Mr. and Ms. Troup File Trademark Applications for the TREATMNT Marks They Developed While Mr. Troup Was Employed by Metagenics.

101. As described above, Mr. Troup developed the TreatMNT trademark while employed by Metagenics and while bound by the Assignment and Confidentiality Agreement. Shortly after his departure from Metagenics—and despite the clear contractual obligation that all Intellectual Property developed by Mr. Troup during his employment is owned by Metagenics—Mr. Troup sought to have variations of the TreatMNT mark registered in Radishing's name (collectively, the "Trademarks").

102. Specifically, under the direction of Mr. and Ms. Troup, Radishing filed a federal trademark application on January 11, 2017 for the following TREATMNT design mark (Serial No. 87297208) in Class 5, claiming an intent to use the mark with dietary and nutritional supplements:



103. Under the direction of Mr. and Ms. Troup, Radishing filed a federal trademark application on January 11, 2017 for the following TREATMNT MEDICAL NUTRITION THERAPY design mark (Serial No. 87297149) in Class 44, claiming an intent to use the mark with nutritional therapy services, namely, developing, providing, and consulting on medical nutrition therapy modules and related products:



104.   Under the direction of Mr. and Ms. Troup, Radishing filed a federal trademark application on January 11, 2017 for the following TREATMNT MEDICAL NUTRITION THERAPY design mark (Serial No. 87297109) in Class 44, claiming an intent to use the mark with nutritional therapy services, namely, developing, providing and consulting on medical nutrition therapy modules and related products:

![TreatMNT medical nutrition therapy logo]

## FIRST CLAIM FOR RELIEF

### (BREACH OF CONTRACT against John Troup)

105.   Metagenics incorporates and realleges the allegations in Paragraphs 1 through 104, inclusive, as though set forth in full.

106.   Metagenics and Mr. Troup entered into the Assignment and Confidentiality Agreement which is more fully described in Paragraphs 22 through 30, above.

107.   Metagenics fully performed its obligations under the Assignment and Confidentiality Agreement.

108.   Mr. Troup breached Section 2.1 of the Assignment and Confidentiality Agreement by (i) disclosing and making available to others Metagenics' Confidential Proprietary Information; (ii) transferring, using, and exploiting Metagenics' Confidential Proprietary Information for his own benefit and the benefit of third parties; (iii) permitting the use and exploitation of Metagenics' Confidential Proprietary Information by third parties; (iv) removing Metagenics' Confidential Proprietary Information from Metagenics' premises; and (v) retaining

Metagenics' Confidential Proprietary Information upon termination of his employment.

109. Mr. Troup breached Section 2.2 of the Assignment and Confidentiality Agreement by failing to notify Metagenics about the unauthorized access to and knowledge or possession of Metagenics' Confidential Proprietary Information by third parties.

110. Mr. Troup breached Section 2.3 of the Assignment and Confidentiality Agreement by failing to return or destroy Metagenics' Confidential Proprietary Information upon termination of his employment.

111. Mr. Troup breached Section 3.1 of the Assignment and Confidentiality Agreement by failing to properly transfer and assign to Metagenics ownership of the Work Product he created while employed by Metagenics (including the Patents, Trademarks, and Domain Names), and by taking ownership of other Metagenics property, including Confidential Proprietary Information.

112. Mr. Troup breached Section 3.2 of the Assignment and Confidentiality Agreement by failing to disclose and deliver to Metagenics Work Product he created while employed by Metagenics (including the Patents, Trademarks, and Domain Names).

113. Mr. Troup breached Section 4 of the Assignment and Confidentiality Agreement by failing to return Metagenics' property upon termination of his employment.

114. Mr. Troup breached Section 5 of the Assignment and Confidentiality Agreement by using Metagenics' name, trademarks, and other materials for purposes other than company business.

115. Mr. Troup breached Section 6.1 of the Assignment and Confidentiality Agreement by creating and operating TreatMNT and undertaking other non-Metagenics projects during normal business hours while employed by Metagenics.

116. Mr. Troup breached Section 6.2 of the Assignment and Confidentiality Agreement by engaging in business activity that is adverse to the business interests of Metagenics, including but not limited to the creation and operation of TreatMNT.

117. As a direct and proximate cause of Mr. Troup's wrongful and illegal conduct, as described immediately above, Metagenics has been damaged. Due to the clandestine nature of Mr. Troup's conduct, Metagenics has not yet been able to fully quantify the monetary damage Mr. Troup has caused Metagenics. However, Metagenics is informed and believes and, on that basis, alleges that Metagenics' monetary damages exceed the minimum amount required for this Court to exercise diversity jurisdiction. Metagenics also seeks disgorgement of the ill-gotten profits Mr. Troup has generated from Metagenics' property, proprietary information and trade secrets.

118. Due to the nature of Mr. Troup's obligations under the Assignment and Confidentiality Agreement, monetary damages cannot fully compensate Metagenics for the ongoing injuries Mr. Troup is causing to Metagenics and Metagenics has no adequate remedy at law. Mr. Troup has taken Metagenics' property, trade secrets and Confidential Proprietary Information in order to allow himself and others to compete directly against Metagenics. This conduct has caused, is causing, and will continue to cause irreparable harm to Metagenics.

119. Accordingly, and as it is entitled under Section 7.2 of the Assignment and Confidentiality Agreement, Metagenics seeks injunctive relief, and more specifically, an injunction: (a) prohibiting Mr. Troup from directly or indirectly utilizing Metagenics' property, trade secrets, or other Confidential Property Information; (b) prohibiting Mr. Troup from further disclosing Metagenics' trade secrets or other Confidential Proprietary Information to third parties; (c) prohibiting Mr. Troup from retaining any Metagenics property, trade secrets, or other Confidential Proprietary Information he took during the course of or upon termination of his employment with Metagenics; (d) compelling Mr. Troup to

properly transfer ownership of Metagenics' tangible and intangible property back to Metagenics; and/or (e) compelling Mr. Troup to disclose to Metagenics the identity of all other persons or entities to whom he has disclosed Metagenics' trade secrets and other Confidential Proprietary Information and/or to whom he has transferred Metagenics' property.

120.    Due to the nature of Mr. Troup's obligations under the Assignment and Confidentiality Agreement, monetary damages cannot fully compensate Metagenics for the ongoing injuries Mr. Troup is causing to Metagenics and Metagenics has no adequate remedy at law.  Mr. Troup has taken Metagenics' property, trade secrets, and Confidential Proprietary Information in order to allow himself and others to compete directly against Metagenics, which is the very type of conduct the Assignment and Confidentiality Agreement seeks to prevent.    Accordingly, Metagenics seeks specific performance of the Assignment and Confidentiality Agreement.

121.    Further, the Assignment and Confidentiality Agreement specifically provides that Metagenics is entitled to specific performance in the case of a breach of Section 3.  Accordingly, Metagenics seeks an order compelling the transfer of title in the Patent Applications, Domain Names, and Trademarks to Metagenics.

122.    Pursuant to Section 7.2 of the Assignment and Confidentiality Agreement, Metagenics is entitled to, and seeks, an award of its reasonable attorneys' fees incurred in connection with this action.

**SECOND CLAIM FOR RELIEF**

**(BREACH OF FIDUCIARY DUTY against John Troup)**

123.    Metagenics incorporates and realleges the allegations in Paragraphs 1 through 104, inclusive, as though set forth in full.

124.    As an officer and executive of Metagenics, Mr. Troup owed fiduciary duties to Metagenics.  In particular, Mr. Troup had a duty not to engage in actions that directly compete with Metagenics' business.

125.   Mr. Troup breached his fiduciary duty to Metagenics by, among other things, misappropriating Metagenics' resources and Confidential Proprietary Information and other trade secrets for his own use and, along with the other Defendants, using that information to create and operate business ventures that compete directly with Metagenics.

126.   As a direct and proximate cause of Mr. Troup's wrongful and illegal conduct, as described immediately above, Metagenics has been damaged. Metagenics has not yet been able to fully quantify the monetary damage Mr. Troup has caused Metagenics.  However, Metagenics is informed and believes and, on that basis, alleges that Metagenics' monetary damages exceed the minimum amount required for this Court to exercise diversity jurisdiction.  Metagenics also seeks disgorgement of the ill-gotten profits Mr. Troup has generated from Metagenics' property, proprietary information and trade secrets.

127.   In doing the acts herein alleged, Mr. Troup is guilty of malice and oppression and has acted with a willful and conscious disregard for the rights of Metagenics, intending to subject Metagenics to cruel and unjust hardship by illegally depriving Metagenics of its money, property, and rights.  As a result of Mr. Troup's conduct, and to deter Mr. Troup from engaging in similar such conduct, Metagenics is entitled to punitive damages in an amount to be determined.

128.   In addition to its other remedies, Metagenics seeks imposition of a constructive trust over the Metagenics property, including Confidential Proprietary Information, that Mr. Troup now has in his possession.

## THIRD CLAIM FOR RELIEF

### (AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

### against Jenna Troup, Radishing LLC, TreatMNT and Does 1-10)

129.   Metagenics incorporates and realleges the allegations in Paragraphs 1 through 104 and 123 through 128, inclusive, as though set forth in full.

130.   As discussed in Paragraphs 123 through 128 above, Mr. Troup breached his fiduciary duty to Metagenics by, among other things, misappropriating Metagenics' resources and Confidential Proprietary Information and other trade secrets for his own use and, along with the other Defendants, using that information to create and operate business ventures that compete directly with Metagenics.

131.   At all relevant times, Defendants Ms. Troup, Radishing, TreatMNT and Does 1 through 10 were fully aware of Mr. Troup's position with Metagenics and were aware that Mr. Troup was breaching his duties to the company.

132.   Through their actions described earlier in this Complaint, and particularly by receiving Metagenics' confidential and proprietary information, assisting Mr. Troup to misappropriate Metagenics' trade secrets and other property and utilizing them for Defendants' own personal gain, and assisting Mr. Troup in creating and operating  business ventures that compete directly with Metagenics, Ms. Troup, Radishing, TreatMNT, and Does 1 through 10 aided and abetted Mr. Troup's breach by providing material assistance or substantial encouragement to Mr. Troup in breaching his fiduciary duty to Metagenics.

133.   As a direct and proximate cause of Defendants' wrongful and illegal conduct, as described immediately above, Metagenics has been damaged. Metagenics has not yet been able to fully quantify the monetary damage that Defendants have caused Metagenics.   However, Metagenics is informed and believes and, on that basis, alleges that Metagenics' monetary damages exceed the minimum amount required for this Court to exercise diversity jurisdiction. Metagenics also seeks disgorgement of the ill-gotten profits Defendants have generated from Metagenics' property, proprietary information and trade secrets.

134.   In doing the acts herein alleged, Defendants are guilty of malice and oppression and have acted with a willful and conscious disregard for the rights of Metagenics, intending to subject Metagenics to cruel and unjust hardship by illegally depriving Metagenics of its money, property, and rights.  As a result of

Defendants' conduct, and to deter Defendants from engaging in similar such conduct, Metagenics is entitled to punitive damages in an amount to be determined.

135.   In addition to its other remedies, Metagenics seeks imposition of a constructive trust over the Metagenics property, including Confidential Proprietary Information, that Defendants now have in their possession.

## FOURTH CLAIM FOR RELIEF

### (BREACH OF DUTY OF LOYALTY against John Troup)

136.   Metagenics incorporates and realleges the allegations in Paragraphs 1 through 104, inclusive, as though set forth in full.

137.   As an officer, executive, and fiduciary of Metagenics, Mr. Troup owed a duty of undivided loyalty to Metagenics.

138.   Mr. Troup breached his duty of loyalty to Metagenics by, among other things, creating and operating competing business ventures owned by him and/or Ms. Troup, during his tenure with Metagenics, including TreatMNT.

139.   Metagenics is informed and believes and, on that basis, alleges that Mr. Troup funneled resources and business opportunities from Metagenics to his competing business ventures, including TreatMNT.

140.   As a direct and proximate cause of Mr. Troup's wrongful and illegal conduct, as described immediately above, Metagenics has been damaged. Metagenics has not yet been able to fully quantify the monetary damage that Mr. Troup has caused Metagenics.  However, Metagenics is informed and believes and, on that basis, alleges that Metagenics' monetary damages exceed the minimum amount required for this Court to exercise diversity jurisdiction.   Metagenics also seeks disgorgement of the ill-gotten profits Mr. Troup has generated from Metagenics' property, proprietary information and trade secrets.

141.   In addition to compensatory damages, Metagenics seeks disgorgement from Mr. Troup of amounts Metagenics provided to Mr. Troup as compensation for services which he never provided to Metagenics.

THEODORA ORINGHER
COUNSELORS AT LAW

142.   In doing the acts herein alleged, Mr. Troup is guilty of malice and oppression and has acted with a willful and conscious disregard for the rights of Metagenics, intending to subject Metagenics to cruel and unjust hardship by illegally depriving Metagenics of its money, property, and rights.  As a result of Mr. Troup's conduct, and to deter Mr. Troup from engaging in similar such conduct, Metagenics is entitled to punitive damages in an amount to be determined.

143.   In addition to its other remedies, Metagenics seeks imposition of a constructive trust over the Metagenics property, including Confidential Proprietary Information, Mr. Troup now has in his possession.

## FIFTH CLAIM FOR RELIEF

### (AIDING AND ABETTING BREACH OF DUTY OF LOYALTY

### against Jenna Troup, Radishing LLC, TreatMNT and Does 1-10)

144.   Metagenics incorporates and realleges the allegations in Paragraphs 1 through 104 and 136 through 143, inclusive, as though set forth in full.

145.   As discussed in Paragraphs 136 through 143 above, Mr. Troup breached his duty of loyalty to Metagenics by, among other things, creating and operating competing business ventures owned by him and/or Ms. Troup, during his tenure with Metagenics, including TreatMNT.

146.   At all relevant times, Defendants Ms. Troup, Radishing, TreatMNT and Does 1 through 10 were fully aware of Mr. Troup's position with Metagenics and were aware that Mr. Troup was breaching his duties to the company.

147.   Through their actions, Ms. Troup, Radishing, TreatMNT and Does 1 through 10 aided and abetted Mr. Troup's breach by providing material assistance or substantial encouragement to Mr. Troup in breaching his fiduciary duty to Metagenics.

148.   Through their actions described earlier in this Complaint, assisting Mr. Troup in creating and operating business ventures that compete directly with Metagenics, and assisting Mr. Troup to misappropriate Metagenics' trade secrets

and other property from Metagenics in order to create and operate those competing ventures, and Ms. Troup, Radishing, TreatMNT and Does 1 through 10 aided and abetted Mr. Troup's breach by providing material assistance or substantial encouragement to Mr. Troup in breaching his fiduciary duty to Metagenics.

149.   As a direct and proximate cause of Defendants' wrongful and illegal conduct, as described immediately above, Metagenics has been damaged. Metagenics has not yet been able to fully quantify the monetary damage Defendants have caused Metagenics.   However, Metagenics is informed and believes and, on that basis, alleges that Metagenics' monetary damages exceed the minimum amount required for this Court to exercise diversity jurisdiction.   Metagenics also seeks disgorgement of the ill-gotten profits Defendants have generated from Metagenics' property, proprietary information and trade secrets.

150.   In doing the acts herein alleged, Defendants are guilty of malice and oppression and have acted with a willful and conscious disregard for the rights of Metagenics, intending to subject Metagenics to cruel and unjust hardship by illegally depriving Metagenics of its money, property, and rights.   As a result of Defendants' conduct, and to deter Defendants from engaging in similar such conduct, Metagenics is entitled to punitive damages in an amount to be determined.

151.   In addition to its other remedies, Metagenics seeks imposition of a constructive trust over the Metagenics property, including Confidential Proprietary Information, that Defendants now have in their possession.

### SIXTH CLAIM FOR RELIEF

### (BREACH OF CONTRACT against Jenna Troup)

152.   Metagenics incorporates and realleges the allegations in Paragraphs 1 through 104, inclusive, as though set forth in full.

153.   As of July 22, 2014, Metagenics and Ms. Troup entered into a written Service Agreement, which is more fully described in Paragraphs 33 through 37, above.

154.   Metagenics fully performed its obligations under the Service Agreement.

155.   Ms. Troup breached the Service Agreement by, among other things, failing to maintain the confidentiality of Metagenics' Confidential Proprietary Information and trade secrets, and instead, utilizing that information for her own personal benefit in violation of Section 7.a. of the Services Agreement.

156.   Ms. Troup also breached the Service Agreement by failing to properly acknowledge Metagenics' right, title and interest in the Work Product she created while performing services for Metagenics, and instead, keeping that Work Product for her own use and for use by the Defendants to develop various business ventures and products to compete with Metagenics.

157.   As a direct and proximate cause of Ms. Troup's wrongful and illegal conduct, as described immediately above, Metagenics has been damaged.  Due to the clandestine nature of Ms. Troup's conduct, Metagenics has not yet been able to fully quantify the monetary damage that Ms. Troup has caused Metagenics. However, Metagenics is informed and believes and, on that basis, alleges that Metagenics' monetary damages exceed the minimum amount required for this Court to exercise diversity jurisdiction.

## SEVENTH CLAIM FOR RELIEF

### (MISAPPROPRIATION OF TRADE SECRETS –

### VIOLATIONS OF 18 U.S.C. §1836 against All Defendants)

158.   Metagenics incorporates and realleges the allegations in Paragraphs 1 through 104, inclusive, as though set forth in full.

159.   At all times relevant hereto, Metagenics owned the trade secrets more fully described in Paragraphs 95 through 96 of this Complaint.  Metagenics took significant efforts to keep, and in fact kept, those trade secrets confidential, and they were not generally known to the public.  Metagenics derived value from those trade

secrets by, among other things, developing, marketing, and selling various products and services throughout the United States and internationally.

160.  By taking Metagenics' Confidential Proprietary Information and trade secrets for their own use and benefit, Defendants intentionally and willfully converted Metagenics' trade secrets for their own economic benefit, knowing that such action would cause injury to Metagenics.

161.  Among other things, Defendants knowingly stole and/or misappropriated Metagenics' trade secrets when Mr. Troup intentionally copied them from Metagenics' computer system and then transferred them, via email, to himself and other Defendants for Defendants' unauthorized and illegal use.

162.  In addition, Defendants knowingly stole and/or misappropriated Metagenics' trade secrets when Mr. Troup and Ms. Troup intentionally copied them from Metagenics' computer system onto portable data storage devices, removed those portable data storage devices and the trade secrets they contained from Metagenics' premises and transferred Metagenics' trade secrets to themselves and other Defendants for Defendants' unauthorized and illegal use.  Later, Mr. Troup deleted thousands of emails from his Metagenics' email account in an effort to hide his malfeasance.

163.  All Defendants received Metagenics' trade secrets knowing that they were stolen and misappropriated from Metagenics and, with that knowledge, used Metagenics' trade secrets for their own benefit.  Among other things, Defendants have created Defendant TreatMNT, have developed products, and are developing additional products based on the illegally acquired trade secrets.

164.  As a direct and proximate cause of Defendants' wrongful and illegal conduct, as described immediately above, Metagenics has been damaged. Metagenics has not yet been able to fully quantify the monetary damage Defendants have caused Metagenics.  However, Metagenics is informed and believes and, on that basis, alleges that Metagenics' monetary damages exceed the minimum amount

1   required for this Court to exercise diversity jurisdiction.  Metagenics also seeks

2   disgorgement of the ill-gotten profits Defendants have generated from Metagenics'

3   property, proprietary information and trade secrets.

4       165.  Defendants' misappropriation of Metagenics' trade secrets was willful

5   and malicious.  As a result of Defendants' conduct, and to deter Defendants from

6   engaging in similar such conduct, Metagenics is entitled to exemplary damages in

7   an amount to be determined pursuant to 18 U.S.C. §1836(b)(3)(C).

8       166.  Monetary damages cannot fully compensate Metagenics for the

9   ongoing injuries Defendants are causing to Metagenics, and Metagenics is entitled

10  to injunctive relief pursuant to 18 U.S.C. §1836(b)(3)(A).  Metagenics seeks a

11  preliminary injunction and/or permanent injunction against Defendants which:

12  (a) prohibits Defendants from directly or indirectly utilizing Metagenics' property,

13  trade secrets, or other Confidential Property Information; (b) prohibits Defendants

14  from further disclosing Metagenics' trade secrets or other Confidential Proprietary

15  Information to third parties; (c) prohibits Defendants from retaining any Metagenics

16  property, trade secrets, or other Confidential Proprietary Information they currently

17  have in their possession; (d) compels Defendants to properly transfer ownership of

18  Metagenics' tangible and intangible property back to Metagenics; and/or

19  (e) compels Defendants to disclose to Metagenics the identity of all other persons or

20  entities to whom Defendants have disclosed Metagenics' trade secrets and other

21  Confidential Proprietary Information and/or to whom Defendants have transferred

22  Metagenics' property.

23      167.  Defendants' misappropriation of Metagenics' trade secrets was willful

24  and malicious.  Accordingly, Metagenics is entitled to an award of attorneys' fees

25  pursuant to 18 U.S.C. §1836(b)(3)(D).

26  ///

27  ///

28  ///

**EIGHTH CLAIM FOR RELIEF**

**(MISAPPROPRIATION OF TRADE SECRETS – VIOLATIONS**

**OF CAL. CIV. CODE §3426, *ET SEQ.* against All Defendants)**

168.  Metagenics incorporates and realleges the allegations in Paragraphs 1 through 104, inclusive, as though set forth in full.

169.  At all times relevant hereto, Metagenics owned the trade secrets more fully described in Paragraphs 95 through 96 of this Complaint.  Metagenics took significant efforts to keep, and in fact kept, those trade secrets confidential, and they were not generally known to the public.  Metagenics derived value from those trade secrets by, among other things, developing, marketing, and selling various products and services.

170.  By taking Metagenics' Confidential Proprietary Information and trade secrets for their own use and benefit, Defendants intentionally and willfully converted Metagenics' trade secrets for their own economic benefit, knowing that such action would cause injury to Metagenics.

171.  Among other things, Defendants knowingly stole and/or misappropriated Metagenics' trade secrets when Mr. Troup intentionally copied them from Metagenics' computer system and then transferred them, via email, to himself and other Defendants for Defendants' unauthorized and illegal use.

172.  In addition, Defendants knowingly stole and/or misappropriated Metagenics' trade secrets when Mr. Troup and Ms. Troup intentionally copied them from Metagenics' computer system onto portable data storage devices, removed those portable data storage devices and the trade secrets they contained from Metagenics' premises, and transferred Metagenics' trade secrets to themselves and other Defendants for Defendants' unauthorized and illegal use.  Later, Mr. Troup deleted thousands of emails from his Metagenics' email account in an effort to hide his malfeasance.

173. All Defendants received Metagenics' trade secrets knowing that they were stolen and misappropriated from Metagenics and, with that knowledge, used Metagenics' trade secrets for their own benefit. Among other things, Defendants have created Defendant TreatMNT, have developed products, and are developing additional products based on the illegally acquired trade secrets. If Defendants did not have actual knowledge that Metagenics' trade secrets had been acquired through improper means, at a minimum, they had reason to and should have known that the trade secrets were acquired through improper means.

174. As a direct and proximate cause of Defendants' wrongful and illegal conduct, as described immediately above, Metagenics has been damaged. Metagenics has not yet been able to fully quantify the monetary damage Defendants have caused Metagenics. However, Metagenics is informed and believes and, on that basis, alleges that Metagenics' monetary damages exceed the minimum amount required for this Court to exercise diversity jurisdiction. Metagenics also seeks disgorgement of the ill-gotten profits Defendants have generated from Metagenics' property, proprietary information and trade secrets.

175. Defendants' misappropriation of Metagenics' trade secrets was willful and malicious. As a result of Defendants' conduct, and to deter Defendants from engaging in similar such conduct, Metagenics is entitled to exemplary damages in an amount to be determined pursuant to Cal. Civ. Code §3426.3.

176. Monetary damages cannot fully compensate Metagenics for the ongoing injuries Defendants are causing to Metagenics, and Metagenics is entitled to injunctive relief pursuant to Cal. Civ. Code §3426.2. Metagenics seeks a preliminary injunction and/or permanent injunction against Defendants which: (a) prohibits Defendants from directly or indirectly utilizing Metagenics' property, trade secrets or other Confidential Property Information; (b) prohibits Defendants from further disclosing Metagenics' trade secrets or other Confidential Proprietary Information to third parties; (c) prohibits Defendants from retaining any Metagenics

property, trade secrets or other Confidential Proprietary Information they currently have in their possession; (d) compels Defendants to properly transfer ownership of Metagenics' tangible and intangible property back to Metagenics; and/or (e) compels Defendants to disclose to Metagenics the identity of all other persons or entities to whom Defendants have disclosed Metagenics' trade secrets and other Confidential Proprietary Information and/or to whom Defendants have transferred Metagenics' property.

177.  Defendants' misappropriation of Metagenics' trade secrets was willful and malicious.  Accordingly, Metagenics is entitled to an award of attorneys' fees pursuant to Cal. Civ. Code §3426.4.

### NINTH CLAIM FOR RELIEF

### (FRAUD against John Troup)

178.  Metagenics incorporates and realleges the allegations in Paragraphs 1 through 104, inclusive, as though set forth in full.

179.  Mr. Troup knowingly and intentionally concealed from Metagenics that, during the term of his employment, he created and operated various business ventures and developed certain products, in particular, TreatMNT and "Flash Flush."  Indeed, Mr. Troup actually used Metagenics' money, property, and resources to develop these competing ventures.  Mr. Troup undertook this scheme with the intent to defraud Metagenics and deprive Metagenics of ownership of these business ventures.

180.  As a fiduciary and executive officer of the company, Mr. Troup had a duty to disclose this information to Metagenics, as Metagenics was the rightful owner of Mr. Troup's work product.  Mr. Troup was informed, and at all relevant times, Mr. Troup was aware of his duties of disclosure.  Relying on this awareness, Metagenics expected full compliance with those duties.

181.  Metagenics had no reason to know of, and in fact did not know of, Mr. Troup's fraud.  Mr. Troup took significant steps to actively conceal his fraud from

THEODORA ORINGHER
COUNSELORS AT LAW

Metagenics, including deletion of data and thousands of emails from Metagenics' computer system.

182.  If these concealed facts had been known to Metagenics, Metagenics would have taken appropriate measures to ensure that Metagenics' right, title, and interest in these properties was properly reflected.  Instead, because Mr. Troup concealed these facts from Metagenics, title to these competing ventures is in the name of Mr. Troup and the other Defendants.

183.  As a direct and proximate cause of Mr. Troup's fraud, Metagenics has been damaged.  Metagenics has not yet been able to fully quantify the monetary damage Defendants have caused Metagenics.  However, Metagenics is informed and believes and, on that basis, alleges that Metagenics' monetary damages exceed the minimum amount required for this Court to exercise diversity jurisdiction.  Metagenics also seeks disgorgement of the ill-gotten profits Mr. Troup has generated from Metagenics' property, proprietary information and trade secrets.

184.  In doing the acts herein alleged, Mr. Troup is guilty of malice, oppression, and fraud, and he has acted with a willful and conscious disregard for the rights of Metagenics, intending to subject Metagenics to cruel and unjust hardship by illegally depriving Metagenics of its money, property, and rights.  As a result of Mr. Troup's fraud, and to deter Mr. Troup from engaging in similar such conduct, Metagenics is entitled to punitive damages in an amount to be determined.

185.  In addition to its other remedies, Metagenics seeks imposition of a constructive trust over the Metagenics property, including Confidential Proprietary Information, Mr. Troup now has in his possession by virtue of his fraudulent acts.

## **TENTH CLAIM FOR RELIEF**

### **(INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE against All Defendants)**

186.  Metagenics incorporates and realleges the allegations in Paragraphs 1 through 104, inclusive, as though set forth in full.

187.   Metagenics relies on various industry partners to conduct research and assist Metagenics to develop new products.   Also, Metagenics primarily sells its products through a network of health care providers and physicians.   Metagenics has a continuing economic relationship with these various third parties, with the probability of future economic benefit to Metagenics.

188.   The Defendants knew about these relationships, and in fact, it was through Mr. and Ms. Troup's employment at Metagenics that they learned about these entities and their relationships with Metagenics.

189.   By taking the acts alleged above, Defendants intended to, and did, disrupt the economic relationships between Metagenics and these third parties. Defendants undertook these acts for their own economic gain.   For example, as more fully described in the Business Plan referenced in Paragraphs 66 through 71, above, Defendants met with a number of Metagenics industry partners to discuss TreatMNT and other competing ventures.   Metagenics also believes that Defendants used a Metagenics' industry partner to conduct important research, which Metagenics paid for, as more fully described in Paragraph 44, above.   Furthermore, Metagenics is informed and believes and, on that basis, alleges that Defendants are and have been attempting to market the competing products that Defendants developed to health care providers and physicians who sell Metagenics' products.

190.   As a direct and proximate cause of Defendants' wrongful and illegal conduct, as described immediately above, Metagenics has been damaged. Metagenics has not yet been able to fully quantify the monetary damage Defendants have caused Metagenics.   However, Metagenics is informed and believes and, on that basis, alleges that Metagenics' monetary damages exceed the minimum amount required for this Court to exercise diversity jurisdiction.

191.   In doing the acts herein alleged, Defendants are guilty of malice and oppression and have acted with a willful and conscious disregard for the rights of Metagenics, intending to subject Metagenics to cruel and unjust hardship by

illegally depriving Metagenics of its money, property and rights.  As a result of Defendants' conduct, and to deter Defendants from engaging in similar such conduct, Metagenics is entitled to punitive damages in an amount to be determined.

## ELEVENTH CLAIM FOR RELIEF

### (UNFAIR COMPETITION – VIOLATIONS OF CAL. BUS. & PROF. CODE §17200, *ET SEQ*. against All Defendants)

192.   Metagenics incorporates and realleges the allegations in Paragraphs 1 through 191, inclusive, as though set forth in full.

193.   In undertaking the acts alleged in this complaint, Defendants have engaged in unfair and unlawful business practices as defined in California Business and Professions Code §17200, *et seq*.  Among other things, Defendants have:

    a.   Misappropriated Metagenics' money and property, including Metagenics' trade secrets, for their own use and benefit, and have used that money and property to create and operate business ventures that directly compete with Metagenics;

    b.   Breached their legal duties to Metagenics and/or aided and abetted a breach of duty by other Defendants; and/or

    c.   Intentionally interfered with Metagenics' business and economic opportunities.

194.   Defendants' unfair and unlawful business practices have directly and proximately caused actual injury to Metagenics.

195.   Metagenics is, pursuant to Cal. Bus. & Prof. Code §17203, entitled to injunctive relief.  Accordingly, Metagenics seeks a preliminary injunction and/or permanent injunction against Defendants which:  (a) prohibits Defendants from directly or indirectly utilizing Metagenics' property, trade secrets or other Confidential Proprietary Information;  (b) prohibits Defendants from further disclosing Metagenics' trade secrets or other Confidential Proprietary Information to third parties; (c) prohibits Defendants from retaining any Metagenics property, trade

secrets, or other Confidential Proprietary Information they currently have in their possession; and/or (d) compels Defendants to disclose to Metagenics the identity of all other persons or entities to whom Defendants have disclosed Metagenics' trade secrets and other Confidential Proprietary Information and/or to whom Defendants have transferred Metagenics' property.

196.   Metagenics also seeks disgorgement of all of Metagenics' money and/or property that Defendants wrongfully took from Metagenics through their unfair and unlawful business practices.

## TWELFTH CLAIM FOR RELIEF

### (DECLARATORY RELIEF against All Defendants)

197.   Metagenics incorporates and realleges the allegations in Paragraphs 1 through 104, inclusive, as though set forth in full.

198.   While he was employed at Metagenics, Mr. Troup assumed a contractual duty, pursuant to the Assignment and Confidentiality Agreement, to ensure that ownership of the Work Product he created during the term of his employment was vested in Metagenics.  The full scope of Mr. Troup's duties to transfer and assign ownership of his Work Product are more fully described in Section 3.1 of the Assignment and Confidentiality Agreement, attached hereto as "Exhibit A."

199.   Metagenics is informed and believes and, on that basis, alleges that Mr. Troup, during his employment with Metagenics, created TreatMNT, registered the Domain Names and developed an internet website for TreatMNT, submitted the Patent Applications, developed and applied for registration of the Trademarks, developed products and/or formulated services, all of which falls within the contractual definition of "Work Product" and, thus, is actually owned by Metagenics.

200.   Due to the Defendants' concealment of their illegal activities, Metagenics has only been able to uncover a partial list of the Work Product that Mr.

Troup and Ms. Troup failed to put in Metagenics' name.

201.   A dispute has now arisen concerning the ownership of various Work Product for which Mr. Troup created or oversaw the development, and which is now in the possession and control of Mr. Troup and the other Defendants.   More specifically, Defendants claim to be the owners of the Patent Applications, Domain Names, and associated websites, Trademarks, Flash Flush product, the @TreatMNT_now Twitter account and the Instagram account @TreatMNT.

202.   Metagenics asks the Court to enter an order declaring Metagenics to be the rightful owner to the Work Product that Mr. Troup and/or Ms. Troup created during Mr. Troup's employment with Metagenics and Ms. Troup's consultancy with Metagenics, including but not limited to the Work Product and property identified in the preceding Paragraph.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Metagenics, Inc. requests judgment on the Complaint as follows:

    A.    On Counts 1 and 9, for monetary damages against Mr. Troup, including disgorgement of the ill-gotten profits he generated from Metagenics' property, proprietary information and trade secrets;

    B.    On Counts 2, 3 and 10, for monetary damages against all Defendants, including disgorgement of the ill-gotten profits they generated from Metagenics' property, proprietary information and trade secrets;

    C.    On Counts 3 and 5, for monetary damages against Ms. Troup, Radishing, TreatMNT and Does 1-10, including disgorgement of the ill-gotten profits they generated from Metagenics' property, proprietary information and trade secrets.;

    D.    On Count 6, for monetary damages against Ms. Troup;

    E.    On Count 9, for an award of punitive or exemplary damages against Mr. Troup;

THEODORA ORINGHER
COUNSELORS AT LAW

F.   On Counts 2, 3 and 10, for an award of punitive or exemplary damages against all Defendants;

G.   On Counts 3 and 5, for an award of punitive or exemplary damages against Ms. Troup, Radishing, TreatMNT and Does 1-10;

H.   On Count 1, for specific performance of the relevant contracts, including the transfer to Metagenics of title and all ownership rights in the Work Product that Mr. Troup and/or Ms. Troup created during their respective periods of employment with Metagenics, including but not limited to the Patent Applications, Domain Names and associated websites, Trademarks, and Flash Flush product, to give practical effect to such relief, an order requiring the Registrar for any of the Domain Names to, within fourteen (14) days of receipt of the order, transfer the Domain Names to Metagenics if Defendants have not already done so;

I.   On Counts 1, 2, 4, 7, 8 and 11, for a preliminary injunction and/or permanent injunction against Defendants which:   (a) prohibits Defendants from directly or indirectly utilizing Metagenics' property, trade secrets, or other Confidential Property Information; (b) prohibits Defendants from further disclosing Metagenics' trade secrets, or other Confidential Proprietary information to third parties; (c) prohibits Defendants from retaining any Metagenics property, trade secrets, or other Confidential Proprietary Information they currently have in their possession; (d) prohibits Defendants from using the "TreatMNT" mark, including but not limited to the Trademarks, Domain Names, and associated websites incorporating the TreatMNT mark; and/or (e) compels Defendants to disclose to Metagenics the identity of all other persons or entities to whom Defendants have disclosed Metagenics' trade secrets and other Confidential Proprietary

Information and/or to whom Defendants have transferred Metagenics' property;

J.   On Count 4, for disgorgement of amounts Mr. Troup improperly obtained from Metagenics;

K.   On Count 11, for disgorgement of all of Metagenics' money and/or property that Defendants wrongfully took from Metagenics through their unfair and unlawful business practices;

L.   On Count 12, for an order declaring Metagenics to be the rightful owner to the Work Product that Mr. Troup and/or Ms. Troup created during their respective periods of employment with Metagenics, including but not limited to the Patent Applications, Domain Names and associated websites, Trademarks, and Flash Flush product, to give practical effect to such relief, an order requiring the Registrar for any of the Domain Names to, within fourteen (14) days of receipt of the order, transfer the Domain Names to Metagenics if Defendants have not already done so;

M.   On Counts 1, 7 and 8, for an appropriate award of attorneys' fees;

N.   For an award of Metagenics' costs and other expenses incurred in this action; and

O.   For all other and further relief as the nature of this cause may require and this Court deems appropriate.

DATED:  January 31, 2017           THEODORA ORINGHER PC


By:   _____/s/ Allan L. Schare_____
Allan L. Schare
Jon-Jamison Hill
Brian J. Headman
Attorneys for Plaintiff Metagenics, Inc.

1

## **DEMAND FOR JURY TRIAL**

2       Plaintiff Metagenics, Inc. hereby demands a Jury Trial as provided by Rule 38

3 of the Federal Rules of Civil Procedure.

4

5 DATED:  January 31, 2017       THEODORA ORINGHER PC

6

7                 By: _____/s/ Allan L. Schare_____

8                      Allan L. Schare

9                      Jon-Jamison Hill

10                    Brian J. Headman

                      Attorneys for Plaintiff Metagenics, Inc.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28